IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LUIS NITSCHE, | ) | Case No. 1:17-cv-1037 |
| | ) | |
| Petitioner, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| RONALD ERDOS, Warden, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Petitioner, Luis Nitsche, seeks a writ of habeas corpus under 28 U.S.C. § 2254, claiming

that his conviction and sentence in *State v. Nitsche,* Case No. CR-14-581917-A, (Cuyahoga

County, Ohio Court of Common Pleas), as affirmed in *State v. Nitsche*, Eighth Dist. Cuyahoga

No. 103174, 2016-Ohio-3170, 66 N.E.3d 135, 2015 Ohio App. LEXIS 2099, violated his

constitutional rights.  ECF Doc. 1.  Respondent Warden, Ronald Erdos[1], has filed a return of

writ.  ECF Doc. 11.  Despite two deadlines to do so, Nitsche filed no traverse.

The matter is again before me by this Court's July 18, 2017 order of reference and Local

Rule 72.2 for preparation of a report and recommendation on Nitsche's petition.  Because each

of Nitsche's claims has been procedurally defaulted, presents only noncognizable state law

---

[1] Ronald Erdos is warden at the Southern Ohio Correctional Facility, where Nitsche was incarcerated
when he filed his petition.  ECF Doc. 1 at 1.  Now, Nitsche, Inmate No. A671374, is incarcerated at the
Mansfield Correctional Institution
(https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A671374), where Ed Sheldon is warden.
(https://www.drc.ohio.gov/manci  (last visited July 24, 2019).

issues or lacks merit, I recommend that the Court DISMISS all of Nitsche's claims for relief and

DENY his petition for writ of habeas corpus.

## II.      Procedural History

### A.      State Trial Court Conviction

A Cuyahoga County, Ohio grand jury issued a twelve-count indictment against Nitsche

on January 23, 2014 charging him as follows

| Count | Charge | Ohio Rev. Code | Offense Date | Specification(s) |
|-------|--------|----------------|--------------|------------------|
| 1 | Aggravated Murder – UF | 2903.01(A) | 1-17-14 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 2 | Murder – UF | 2903.02(B) | 1-17-14 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 3 | Felonious Assault – F2 | 2903.11(A)(1) | 1-17-17 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 4 | Firearm Discharge-Prohibited Premises –F1 | 2923.162(A)(3) | 1-17-14 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 5 | Having Weapons Under Disability – F3 | 2929.13(A) | 1-17-14 | |
| 6 | Attempted Murder – F1 | 2903.02(A) | 12-23-13 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 7 | Felonious Assault – F2 | 2903.11(A)(1) | 12-23-13 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 8 | Felonious Assault – F2 | 2903.11(A)(2) | 12-23-13 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 9 | Aggravated Robbery – F1 | 2911.01(A)(1) | 12-23-13 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 10 | Aggravated Robbery – F1 | 2911.01(A)(3) | 12-23-12 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |
| 11 | Having Weapons Under Disability – F3 | 2923.13(A)(3) | 12-23-13 | |
| 12 | Firearm Discharge-Prohibited Premises –F1 | 2923.162(A)(3) | 12-23-13 | 1-year /3-year firearm specifications – 2941.141(A), 145(A) |

ECF Doc. 11-1 at 5.  Counsel was appointed, and Nitsche pleaded not guilty to the charges.

Prior to trial, Nitsche moved for separate trials of the Count One through Five charges,

involving the death of Lawelden McDowell from the trial of the Count Six through Twelve

charges involving the injury to Berry Dean, asserting that trying the charges together would

unfairly prejudice Nitsche's defense and "invite[] the passions and prejudices of the jury."  ECF

Doc. 11-1 at 14.  The state opposed the motion.  ECF Doc. 11-1 at 18.  Nitsche also filed a

motion in limine to preclude any mention of his alleged connection to the Heartless Felons gang

at trial.  ECF Doc. 11-1 at 28.  The trial court denied the motion to sever and granted the motion

in limine.  ECF Doc. 11-1 at 31.  And it overruled Nitsche's motion to reconsider the denial of

his motion to sever.  ECF Doc. 11-1 at 34.

2

Nitsche later moved to dismiss the indictment, contending it suffered from defects in how the crimes charged were presented to the grand jury. ECF Doc. 11-1 at 35. The trial court overruled the motion. ECF Doc. 11-1 at 55.

Before the trial commenced, Nitsche waived his right to a jury trial on the two counts of having weapons under disability. ECF Doc. 11-1 at 56. The case proceeded to jury trial on the remaining counts on May 18, 2015. On May 27, 2015, the jury returned verdicts finding Nitsche not guilty of aggravated robbery and the attached specifications charged in Count Ten; the court granted Rule 29 motions for judgment of acquittal on Count Four and Count Twelve; the court found Nitsche guilty on the Count Five and Count Eleven weapon under disability charges; and the jury found Nitsche guilty of all remaining charges and specifications. ECF Doc. 11-1 at 57.

At the June 4, 2015 sentencing hearing, the court merged Counts One, Two and Three relating to the shooting death of Lawelden McDowell, and the state elected to have Nitsche sentenced on the Count One aggravated murder charge. ECF Doc. 11-9 at 29. The court also merged the three-year and one-year firearm specifications on Counts One, Two and Three, and the state elected to have Nitsche sentenced only on the three-year specification attached to Count One. *Id.* at 29-30. Further, the court merged Counts Six, Seven and Eight, and the attached three-year and one-year firearm specifications. The state elected to have Nitsche sentenced on the Count Six attempted murder charge and the three-year firearm specification attached to that count. *Id.* The court did not merge the Count 5 and Count 11 charges of having a weapon under disability. And it declined Nitsche's request to merge the Count 9 aggravated robbery charge with the Count Six attempted murder charge.

After hearing arguments from counsel and offering the opportunity for allocution by the defendant, the court imposed the following sentences:

| Count | Charge | Sentence | Specification Sentence |
|---|---|---|---|
| 1 | Aggravated Murder – UF | Life without parole eligibility | 3-year mandatory, consecutive |
| 2 | Murder – UF | Merged w/ Ct. 1 | Merged w/ Count 1 |
| 3 | Felonious Assault – F2 | Merged w/ Ct. 1 | Merged w/ Count 1 |
| 4 | Firearm Discharge-Prohibited Premises –F1 | Dismissed – Rule 29 | |
| 5 | Having Weapons Under Disability – F3 | 24 months concurrent with Count 1 | |
| 6 | Attempted Murder – F1 | 11 years consecutive to Count 1 | 3-year mandatory, consecutive |
| 7 | Felonious Assault – F2 | Merged with Ct. 6 | Merged with Count 6 |
| 8 | Felonious Assault – F2 | Merged with Ct. 6 | Merged with Count 6 |
| 9 | Aggravated Robbery – F1 | 3 years – concurrent with Ct. 6 | 3-year mandatory, consecutive |
| 10 | Aggravated Robbery – F1 | Not guilty verdict | |
| 11 | Having Weapons Under Disability – F3 | 24 months – concurrent with Ct. 6 | |
| 12 | Firearm Discharge-Prohibited Premises –F1 | Dismissed – Rule 29 | |

ECF Doc. 11-1 at 59-60.  In sum, Nitsche was ordered to serve an aggregate sentence of life in prison without parole eligibility plus twenty years, as follows: nine years of mandatory time on the three three-year terms on the firearm specifications, prior and consecutive to his term of life imprisonment on the aggravated murder charge, followed by an eleven-year consecutive term on the attempted murder charge.  The trial court waived court costs but ordered Nitsche to pay restitution in the amount of $2,880 to cover funeral expenses incurred by Lawelden McDowell's family.  *Id.*

### B.     Direct Appeal

Nitsche, represented by new counsel, filed a timely notice of appeal to the Ohio Court of Appeals on June 23, 2015.  ECF Doc. 11-1 at 61.[2]  Nitsche's appellate brief asserted six assignments of error:

> Assignment of Error Number 1: Six years for consecutive firearm specifications for aggravated robbery and attempted murder in the shooting Berry Dean is  error.
>
> Assignment of Error Number 2: The trial court erred in ordering restitution.
>
> Assignment of Error Number 3: The court's failure to consider Nitsche's young age in imposing a sentence of life without parole violates his Eighth Amendment protection against cruel and unusual punishment.

---

[2] Nitsche's counsel actually filed two notices of appeal.  The first, ECF Doc. 11-1 at 67, was dismissed *sua sponte* by the Ohio Court of Appeals on August 4, 2015 because it duplicated the one the court intended to act upon.  ECF Doc. 11-1 at 75.

Assignment of Error Number 4: The court erred in considering Nitsche's alleged gang affiliation when imposing sentence.

Assignment of Error Number 5: The manifest weight of the evidence was not established to allow for convictions in any of the crimes in either incident.

Assignment of Error Number 6: The trial court abused its discretion in joining, in one trial, the Berry Dean and Lewaldon [*sic*] McDowell shooting incidents.

ECF Doc. 11-1 at 78. The State filed a brief opposing Nitsche's arguments. *Id.* at 95. In a May 26, 2016 journal entry and opinion, the Ohio Court of Appeals: (1) reversed the trial court's order that Nitsche should pay restitution and remanded the case[3] so that Nitsche's future ability to pay restitution could be determined; and (2) affirmed Nitsche's convictions and all other aspects of his sentence. ECF Doc. 11-1 at 186; *State v. Nitsche*, Eighth Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 100, 66 N.E.3d 135.

Nitsche, *pro se*, filed a timely notice of appeal and memorandum in support of jurisdiction in the Ohio Supreme Court on July 6, 2016. ECF Doc. 11-1 at 188, *Id*. at 190. Nitsche raised five propositions of law:

Proposition of Law I: Six years for consecutive firearm specifications for aggravated robbery and attempted murder in the shooting [of] Berry Dean is error.

Proposition of Law II: The court's failure to consider Nitsche's young age in imposing a sentence of life without parole violates his Eighth Amendment protection against cruel and unusual punishment.

Proposition of Law III: The court erred in considering Nitsche's alleged gang affiliation when imposing sentence.

Proposition of Law IV: The manifest weight of the evidence was not established to allow for convictions in any of the crimes in either incident.

Proposition of Law V: The trial court abused its discretion in joining, in one trial, the Berry Dean and Lewaldon [*sic*] McDowell shooting incidents.

---

[3] Upon remand, the trial court determined Nitsche did not have the future ability to pay restitution, and the requirement for restitution was abandoned. ECF Doc. 11-1 at 336.

ECF Doc. 11-1 at 191.  The state did not file a brief.  The Ohio Supreme Court declined jurisdiction by an entry dated November 9, 2016.  ECF Doc. 11-1 at 233.

### C.      Ohio App. R. 26(B) Application to Reopen Direct Appeal

While his Ohio Supreme Court jurisdiction request was pending, Nitsche filed a *pro se* motion in the Ohio Court of Appeals on July 13, 2016 seeking an order requiring his appellate counsel to provide him with "all trial transcripts and all evidence relating to Cuyahoga County Case No. CR-14-581917-A for the purpose of raising potentially new errors and claims in an App. R. 26(B) motion and other procedural motions to attack his conviction." ECF Doc. 11-1 at 234.  The court of appeals denied the motion, noting that the "appeal was journalized on May 26, 2016." ECF Doc. 11-1 at 237.

Nitsche then filed a *pro se* App. R. 26(B) application to reopen his direct appeal on August 29, 2016, asserting he had received ineffective assistance of appellate counsel because the following assignments of error were not included in his direct appeal:

> Assignment of Error I:
> The Trial court violated Luis Nitsche's due process rights to a fair trial in contravention of the Fifth, Sixth, and Fourteenth Amendment to the U.S. Constitution, Evid. R. 404(B), and abused its discretion when it denied Luis Nitsche's request for a mistrial based upon witness testimony of a prejudicial unfounded prior bad act.
>
> Assignment of Error II:
> The State of Ohio denied appellant his right to the confrontation clause and cross examination of the Sixth and Fourteenth Amendment to the U.S. Constitution when the State's witness refused to testify during cross examination.
>
> Assignment of Error III:
> The trial court erred to the material prejudice of appellant in admitting into evidence in the State's case in chief testimony of a prior bad act allegedly committed by appellant. The erroneous admission of this evidence was in contravention of Evid. R. 403, and 404, and deprived appellant of his right to a fair trial guaranteed by the Fifth, and Fourteenth Amendments to the United States Constitution and Article One, Section Sixteen of the Ohio Constitution, and committed plain and reversible error when it failed to give a limited instruction regarding "other acts".

Assignment of Error IV:
Appellant's trial counsel was ineffective in violation of the
Sixth and Fourteenth Amendments to the U.S. Constitution Instruction for a lesser
included offense of voluntary manslaughter.

Assignment of Error V:
Appellant's due process rights to the Fifth and Sixth Amendment
to the U.S. Constitution were violated when the government presented an extremely
suggestive photograph for the purpose of identification when interviewing a key witness.

Assignment of Error VI:
The trial court violated appellant's Fifth and Fourteenth Amendment to the U.S.
Constitution to be free from self- incrimination when it used his silence against him
during sentencing.

Assignment of Error VII:
The trial court violated the double jeopardy clause in both the United States and Ohio
Constitutions and R.C. § 2941.25 and *State v. Johnson*, 128 Ohio St.3d 153, 162-163,
2010-Ohio-6314 when it sentenced appellant for as allied offenses.

ECF Doc. 11-1 at 238.  The state filed an opposition brief on September 28, 2016.  ECF Doc. 11-

1 at 257.

On October 24, 2016, Nitsche filed a motion to amend his App. R. 26(B) application,

asserting that his review of his indictment led him to believe he had additional claims to present

that his rights Double Jeopardy Clause and Due Process Clause under the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution and his corresponding rights under the

Ohio Constitution had been violated.  *Id.* 269.  On the same day, Nitsche filed a reply to the

state's opposition brief.  ECF Doc. 11-1 at 271.

On February 15, 2017, the Ohio Court of Appeals denied Nitsche's motion to amend his

application to reopen.  ECF Doc. 11-1 at 277.  On the same date, the court denied Nitsche's

application to reopen his direct appeal, finding the application to have been untimely filed, filed

without a notarized affidavit as required by App. R. 26(B)(2)(d), and lacking in merit.  ECF Doc.

11-1 at 278, 294.  Nitsche filed a *pro se* application for reconsideration "per Ohio App. R.

7

26(A)" on February 28, 2017.  ECF Doc. 11-1 at 295.  The Ohio Court of Appeals denied the

application for reconsideration in an entry filed May 21, 2017, finding that the court's authority

to reconsider under App. R. 26(A) was limited to causes or motions submitted on appeal, not

applications to reopen under App. R. 26(B).  ECF Doc. 11-1 at 305.

On March 23, 2017, Nitsche filed a *pro se* notice of appeal, ECF Doc. 11-1 at 306, and a

memorandum in support of jurisdiction, ECF Doc. 11-1 at 307, in the Ohio Supreme Court

concerning the denial of his application to reopen his direct appeal.  Nitsche's memorandum

raised seven propositions of law:

> Proposition of Law No. I: Appellant received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment to the United States Constitution afforded by *Strickland v. Washington*, 466 US. 668; 104 S. Ct. 2052; 80 L. Ed. 2D 674, and *State v. Murnahan* (1992), 63 Ohio St. 3d 60; 584 N.E.2d 1204 when his appellate counsel, Brian R. McGraw, failed to raise the following proposition of law which prejudicially affected the outcome of his appeal: The Trial court violated Luis Nitsche's due process rights to a fair trial in contravention of the Fifth, Sixth, and Fourteenth Amendment to the U.S. Constitution, Evid. R. 404(B), and abused its discretion when it denied Luis Nitsche's request for a mistrial based upon witness testimony of a prejudicial unfounded prior bad act.

> Proposition of Law No. II: Appellant received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment to the United States Constitution afforded by *Strickland v. Washington*, 466 US. 668; 104 S. Ct. 2052; 80 L. Ed. 2D 674, and *State v. Murnahan* (1992), 63 Ohio St.3d 60; 584 N.E.2d 1204 when his appellate counsel, Brian R. McGraw, failed to raise the following proposition of law which prejudicially affected the outcome of his appeal: The State of Ohio denied appellant his right to the confrontation clause and cross examination of the Sixth and Fourteenth Amendment to the U.S. Constitution when the State's witness refused to testify during cross examination.

> Proposition of Law No. III: Appellant received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment to the United States Constitution afforded by *Strickland v. Washington*, 466 US. 668; 104 S. Ct. 2052; 80 L. Ed. 2D 674, and *State v. Murnahan* (1992), 63 Ohio St. 3d 60; 584 N.E.2d 1204 when his appellate counsel, Brian R. McGraw, failed to raise the following proposition of law which prejudicially affected the outcome of his appeal: The trial court erred to the material prejudice of appellant in admitting into evidence in the State's case in chief testimony of a prior bad act allegedly committed by appellant. The erroneous admission of this evidence was in contravention of Evid. R. 403, and 404, and deprived appellant of his right to a

fair trial guaranteed by the Fifth, and Fourteenth Amendments to the United States Constitution and Article One, Section Sixteen of the Ohio Constitution, and committed plain and reversible error when it failed to give a limited instruction regarding "other acts".

Proposition of Law No. IV: Appellant received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment to the United States Constitution afforded by *Strickland v. Washington*, 466 US. 668; 104 S. Ct. 2052; 80 L. Ed. 2D 674, and *State v. Murnahan* (1992), 63 Ohio St.3d 60; 584 N.E.2d 1204 when his appellate counsel, Brian R. McGraw, failed to raise the following proposition of law which prejudicially affected the outcome of his appeal: Appellant's trial counsel was ineffective in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution Instruction for a lesser included offense of voluntary manslaughter.

Proposition of Law No. V: Appellant received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment to the United States Constitution afforded by *Strickland v. Washington*, 466 US. 668; 104 S. Ct. 2052; 80 L. Ed. 2D 674, and *State v. Murnahan* (1992), 63 Ohio St.3d 60; 584 N.E.2d 1204 when his appellate counsel, Brian R. McGraw, failed to raise the following proposition of law which prejudicially affected the outcome of his appeal: Appellant's due process rights to the Fifth and Sixth Amendment to the U.S. Constitution were violated when the government presented an extremely suggestive photograph for the purpose of identification when interviewing a key witness.

Proposition of Law No. VI: Appellant received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment to the United States Constitution afforded by *Strickland v. Washington*, 466 US. 668; 104 S. Ct. 2052; 80 L. Ed. 2D 674, and *State v. Murnahan* (1992), 63 Ohio St.3d 60; 584 N.E.2d 1204 when his appellate counsel, Brian R. McGraw, failed to raise the following proposition of law which prejudicially affected the outcome of his appeal: The trial court violated appellant's Fifth and Fourteenth Amendment to the U.S. Constitution to be free from self- incrimination when it used his silence against him during sentencing.

Proposition of Law No. VII: Appellant received ineffective assistance of appellate counsel in violation of his Sixth and Fourteenth Amendment to the United States Constitution afforded by *Strickland v. Washington*, 466 US. 668; 104 S. Ct. 2052; 80 L. Ed. 2D 674, and *State v. Murnahan* (1992), 63 Ohio St.3d 60; 584 N.E.2d 1204 when his appellate counsel, Brian R. McGraw, failed to raise the following proposition of law which prejudicially affected the outcome of his appeal: The trial court violated the double jeopardy clause in both the United States and Ohio Constitutions and R.C. § 2941.25 and *State v. Johnson*, 128 Ohio St.3d 153, 162-163, 2010-Ohio-6314 when it sentenced appellant for allied offenses.

*Id.* at 308-309.  The Ohio Supreme Court declined to accept jurisdiction of the appeal in an entry

dated May 31, 2017.  ECF Doc. 11-1 at 335.

### D.      Federal Habeas Corpus Petition

Nitsche is deemed to have filed his *pro se* petition for writ of habeas corpus in this court

on May 8, 2017, applying the prison mailbox rule.  ECF Doc. 4.  Nitsche now raises four

grounds for relief:

**GROUND 1:**
SIX YEARS FOR CONSECUTIVE FIREARM SPECIFICATIONS FOR AGGRAVATED
ROBBERY AND ATTEMPTED MURDER IN THE SHOOTING OF BERRY DEAN IS
ERROR.

**Supporting Facts:** Petitioner was found guilty of attempted murder (Count 6) and Aggravated
Robbery (Count 9) in the shooting of Berry Dean on December 23, 2013. In each count,
Petitioner was also found guilty of one and three year firearm specifications, which merged into
a single three year specification on each count. The trial court, after lengthy discussion, imposed
a three year firearm specification for each of the two counts, to run consecutive to one another,
relying on R.C. 2929.14(B)(l)(b) and the holding in *State. v. Lawrence,* 2014-Ohio-4797.

The trial court imposing consecutive sentences for one gun used in one incident on one victim
does not comport with the mandates of the United States Constitution against Double Jeopardy
and its clearly in violation of R.C. 2929.14.(B)(l)(b).

**GROUND 2:**
THE COURT'S FAILURE TO CONSIDER NITSCHE'S YOUNG AGE IN IMPOSING A
SENTENCE OF LIFE WITHOUT PAROLE VIOLATES HIS EIGHTH AMENDMENT
PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT.

**Supporting Facts:** At the time of the alleged crimes herein, Petitioner was twenty-three (23)
years old. The evidence, if believed, suggests that Petitioner was involved in a romantic
relationship with a woman (Mary Ann Jackson) and committed two acts of violence in what is
most commonly known as a "lover's triangle" situation. While there is a conviction for
Aggravated Robbery, a fair view of the record and evidence would indicate that Petitioner's
motives (if the evidence is to be believed) was that of a spurned lover.

Petitioner was sentenced to life without parole for the Aggravated Murder conviction. In recent
years studies have shown that the brain doesn't not fully develop sometimes until the age of 25.
Recently, the United States Supreme Court held that juvenile offender's youth must be taken into
account before a life without parole sentence can be imposed. See *Roper* v. *Simmons,* 543 U.S.
551; 125 S. Ct. 1183; 161 L.Ed. 2d 1, the Court reasoning is that juvenile's lack of maturity and
an underdeveloped sense of responsibility, recklessness, compulsivity, and heedless risk-taking
could play a part in their alleged crime. Studies and scientific evidence have shown that these
factors does not end once a human being reaches the age of eighteen (18) but rather the brain
doesn't fully reach maturity until the age of twenty- five (25).

10

The Supreme Court went onto rule that sentencing a juvenile to life without parole violates the Eighth Amendment to the United States Constitution. Petitioner believes that the same applies to him if evidence is to be believed at trial, and being that the trial court imposed a life sentence without the possibility of parole for crimes he allegedly
committed when only 23 years old.

**GROUND 3:**
THE COURT ERRED IN CONSIDERING NITSCHE'S ALLEGED GANG AFFILIATION WHEN IMPOSING SENTENCE.

**Supporting Facts:** Petitioner was convicted of committing two violent acts. The jury chose to believe the testimony that it heard at trial. Petitioner's case had absolutely nothing to do with gang activity and the record is devoid of any testimony or allegations that Petitioner actions were related to gang activity or affiliation. During sentencing the trial court stated before sentencing Petitioner:

> And even though it did not come out in the trial, you are a Heartless Felon. You are proud of being a Heartless Felon. You give the signs of being a Heartless Felon. You are tattooed with it. This is who you are, which is why I restricted your communications in jail. You take pride in being a Heartless Felon. And you try to impart fear in others that cross you.
>
> **And it's for that reason that on the count of aggravated murder, the Court is imposing a sentence of life imprisonment without the possibility of parole...**

The court made it clear that it was sentencing Petitioner to life imprisonment without the possibility of parole for being affiliated with a gang, although it had nothing to do with the crime committed.

**GROUND 4:**
THE TRIAL COURT ABUSED ITS DISCRETION IN JOINING, IN ONE TRIAL, THE BERRY DEAN AND LEWALDON [*SIC*] MCDOWELL SHOOTING INCIDENTS.

**Supporting Facts:** In this matter, there were two separate crimes which took place. Both involved shootings, however both involved separate victims at different times and places. The grand jury indicted Petitioner for the shooting/wounding of Berry Dean on December 23, 2013 and the shooting/death of Lewaldon [*sic*] McDowell on January 27, 2014. Petitioner's trial counsel moves to sever the charges pursuant to Criminal Rule 14 so that Petitioner would not be unfairly tried for both incidents by one jury. The court denied that motion.

The incidents involved were both violent in nature and could have been tried separately. A jury by nature, would be much more inclined to believe in the guilt of Petitioner in the second incident after hearing evidence of a shooting in the first incident and vice versa.

The trial court abused its discretion in denying the motion to sever charges and this denied Petitioner a right to a fair trial.

11

ECF Doc. 4 at 7-12.  Warden Erdos filed a return of writ and the state court record on October 3, 2017.  ECF Doc. 15, ECF Doc. 11-1.  Nitsche did not file a traverse.  The matter is ripe for disposition.

## III.    The Facts

The analysis of Nitsche's petition begins with the "summary of the evidence pertinent to the issues raised in Nitsche's appeal"[4] found in the appellate record by the Ohio Court of Appeals:

{¶ 5}   In late September or early October 2013, Maryann Jackson met Nitsche, also known as "Yellow," through a friend, Karen Osborn. By November 2013, Nitsche was her boyfriend. Jackson described her relationship with Nitsche as "crazy," i.e., "one minute we can be cool and then the next minute we're not," "[a]rguing, fighting, stuff like that." Although she and Nitsche were purportedly "exclusive," while dating Jackson, she also began seeing and "talking with" McDowell, who was also known as "Woo."

{¶ 6}   On the evening of December 22, 2013, Jackson went out drinking with McDowell. Jackson testified that Nitsche had apparently been informed that she had been out with someone else because when she came home, Nitsche called her and said "b****, come get me right now." Jackson drove to Clark Avenue in Cleveland to pick Nitsche up and the couple immediately began arguing. Jackson stated that Nitsche was upset because another man had dropped her off and he wanted to know with whom she had been. She testified that when they arrived at Jackson's apartment on Loop Drive in Cleveland, they continued arguing and that Nitsche was "acting crazy," knocking over Jackson's furniture and other belongings. Although she initially denied it, Jackson ultimately admitted to Nitsche that she had been out with someone else. Jackson testified that Nitsche demanded that she identify the other man she had been seeing. When Jackson refused, Nitsche told her to call that man.

{¶ 7}   Jackson testified that, at first, she refused but Nitsche persisted and told her she had "better call them." Because she did not want to disclose that she had been out with McDowell, Jackson dialed a "random number" stored in her cell phone contacts list. That number was Dean's. Jackson and Dean had gone to middle school together and, more recently, had run into each other at a club on West 6th Street. Dean testified that after meeting at the club, he and Jackson had talked on the phone a couple of times but that, prior to December 23, 2013, he had not heard from Jackson "for a while."

{¶ 8}   Jackson testified that after she dialed Dean's number, she hung up and told Nitsche that he didn't answer. Nitsche told her to call Dean again. At approximately 2:00 or 3:00 a.m. on December 23, 2013, Jackson called Dean again and he answered.

---

[4] *State v. Nitsche*, 2016-Ohio-3170 at ¶4.

Following Nitsche's directive, Jackson told Dean "to come back and come get me." Jackson testified, however, that she did not actually want Dean to come over because she had not been out with Dean; she had been out with McDowell. Jackson stated that although she had asked Dean to come over, she knew Dean "wasn't coming to my house or anything like that" because Dean had never been to her apartment and did not know her address. Nevertheless, she told Nitsche that Dean was "on his way." Nitsche and Jackson sat and waited for Dean.

{¶ 9}   When Dean did not arrive promptly, Nitsche told Jackson to call Dean again. Jackson testified, that once again, she followed Nitsche's directive and called Dean. Dean answered, but Jackson "acted like he didn't," so Nitsche then demanded that she text Dean. Jackson texted Dean and Dean replied, but Jackson ignored his response. Jackson testified that she did what Nitsche told her to do because he was "sitting right there watching me" and she was "lightweight scared * * * [b]ecause of what he might do." Nitsche then took Jackson's phone and texted Jackson's address to Dean himself.

{¶ 10} Dean testified that he received numerous texts from Jackson in the early morning hours of December 23, 2013, asking him to come to her home and provided her address. In response to her texts, he left his home in Cleveland Heights and drove to her apartment.

{¶ 11} Jackson testified that after Nitsche texted her address to Dean, she lied and told Nitsche that Dean was outside and she then ran outside and called Dean. Jackson testified that Dean answered and that she told him not to come and that she would see him the following day. Jackson explained that she told Dean not to come to her apartment because she was worried that Dean would tell Nitsche that Jackson had not been out with him and that she would then have to disclose to Nitsche who she had really been seeing, i.e., McDowell.

{¶ 12} Jackson testified that when Dean did not arrive, Nitsche took Jackson's phone, called Dean's number and handed the phone to Jackson. Jackson spoke to Dean and asked him where he was. Dean told her that he was on his way and Jackson and Nitsche then waited outside for him. Dean testified that he spoke with Jackson several times while he was driving to her apartment but that he did not recall what was said during those calls.

{¶ 13} Dean testified that when he reached Jackson's apartment, he parked on the street. He started walking towards the building in which he believed Jackson resided and saw Jackson appear from the opposite side of the building. He testified that as soon as he saw Jackson's face, he knew something was wrong. He turned around to leave but, in that "split second," he was shot. Dean testified that after he was shot, he "[i]nstantly * * * went paralyzed from the waist down" and fell to the ground. Dean stated that the shooter, a male with a light-skinned complexion wearing a hoodie and a black ski mask, stood over him pointing a gun at his face. The shooter reached down, took Dean's cell phone from his hand and his wallet from his back pocket. The shooter and Jackson then ran off. Dean testified that he did not know the person who had shot him.

13

{¶ 14} Jackson testified that, as she approached Dean, he called out her name. She saw Nitsche come up from behind Dean and shoot him once. Jackson testified that after he shot Dean, Nitsche told her to get her car and meet him at the "back of the Loop." Jackson did as Nitsche instructed. She testified that she did nothing to help Dean and did not call the police or EMS" [b]ecause I was with Yellow." After the shooting, Jackson and Nitsche went to Osborn's apartment and while they were driving to Osborn's apartment, Nitsche was talking on his cell phone, cussing and saying, "I just had to shoot this n**** over her, stuff like that." Jackson and Nitsche stayed at Osborn's apartment until morning. The next morning, Jackson dropped Nitsche off on Clark Avenue in Cleveland.

{¶ 15} Dean testified that after Jackson and Nitsche ran off, he put his car keys in his mouth, dragged himself into the street and crawled towards his car using his arms to pull his body forward. As he crawled towards his vehicle, a police car approached. Dean waved down the police car and Cuyahoga Metropolitan Housing Authority ("CMHA") police officer Demetrius Jackson stopped and provided assistance. Officer Jackson testified that he found Dean lying in the street near 2768 Loop Drive, bleeding and in pain, unable to move the lower half of his body. Dean told Officer Jackson what had happened, provided a description of the shooter and Officer Jackson called for an ambulance, talking with Dean until the ambulance arrived. After Dean was placed in the ambulance, he passed out. He awoke at MetroHealth Hospital. Dean underwent seven surgeries and was hospitalized for nearly two-and-a-half months. He is paralyzed and wheelchair bound as a result of the shooting. The bullet with which Dean was shot remains lodged in his spine.

{¶ 16} CMHA police investigated the shooting of Dean. Detective Robert Weis, one of the CMHA detectives involved in the investigation, testified that, later that morning, CMHA officers recovered a spent nine-millimeter shell casing at the Loop Drive crime scene and obtained a statement from Jackson identifying Nitsche as the person who had shot Dean. Jackson admitted that she did not immediately tell the police that Nitsche had shot Dean. She testified that it was only after the police told her that they did not believe she had not seen the shooter and read Jackson her *Miranda* rights that she identified Nitsche as the person who shot Dean. Weis testified that he investigated whether there were any working cameras in the area that could have captured the shooting of Dean but found none. Based on Jackson's statement, CMHA police undertook efforts to locate Nitsche and a warrant was issued for his arrest later that day, i.e., on December 23, 2013.

{¶ 17} Jackson testified that although she had ended her relationship with Nitsche after he shot Dean, she continued seeing McDowell. At that time, McDowell had a girlfriend, Brittney Gardner. On the evening of January 16, 2014, Jackson was with McDowell, Osborn and McDowell's best friend, Donald Wylie, who was also known as "Don Don." At approximately 8:00 or 9:00 p.m., McDowell and Wylie picked up Osborn and Jackson at Osborn's apartment at 8201 Madison Avenue in Cleveland and the group rode in McDowell's car, "riding around" with "no particular destination."

14

{¶ 18} Wylie testified that he had been with McDowell the entire day and acknowledged that earlier in the day, he and McDowell had been "getting high," "kicking back, having a good time." He indicated that he and McDowell had smoked" [a]bout three, four blunts" that day but that they "were done doing what we was doing" when they were riding around in the car with Jackson and Osborn. He later admitted, on cross-examination, that they had been "getting high all night." Wylie testified that McDowell and Jackson were "romantically involved" but that "it wasn't that serious," "[b]ecause Woo still had Brittney [sic] and [Jackson] was still talking to Yellow.

{¶ 19} Osborn testified that while the group was "riding around," she received calls on her cell phone from Nitsche. She explained that Nitsche could not reach Jackson directly because Jackson had left her cell phone at Osborn's apartment when they went out. Osborn stated that she knew the calls were from Nitsche because she recognized his phone number and that, at first, she simply ignored the calls.

{¶ 20} At some point during the evening however, Osborn answered her phone when Nitsche called, placing her phone on speaker so that others in the vehicle could hear their conversation. Osborn testified that she recognized Nitsche's voice and that Nitsche told her Jackson was pregnant with his child. Osborn stated that Nitsche asked Osborn who Jackson was with and began "mak[ing] threats." Osborn testified that Nitsche said he "was going to f*** her up wherever we're at" and "kept saying" that he was coming over to Osborn's apartment.

{¶ 21} Osborn testified that McDowell, who had been listening to their conversation via the speaker phone, asked Nitsche whether he and Jackson were still messing around and talking like in a relationship" and that Nitsche replied that they were. She indicated that McDowell told Nitsche that he and Jackson had been "talking" as well and that Nitsche then asked McDowell whether he had a sexual relationship with Jackson. According to Osborn, McDowell handed the phone to Jackson so that she could answer Nitsche's question but she refused. Osborn testified that Jackson "wouldn't say nothing" and kept pushing the phone away. According to Jackson, McDowell told Nitsche that he and Jackson had been seeing each other for a couple months and confirmed that they had a sexual relationship.

{¶ 22} Brittney Gardner, McDowell's girlfriend, also called Osborn's cell phone that evening. Wylie testified that, at some time earlier that evening, Jackson and McDowell had been arguing and that Jackson went to McDowell's house to confront Gardner and inform her that she and McDowell were "messing with each other." According to Jackson, she went to Gardner's house to show Gardner "who Woo was with that night." McDowell, Osborn and Wylie were present and witnessed the argument that ensued between Gardner and Jackson. Osborn testified that Jackson knocked on the front door and that when Gardner answered it, the two women began "exchanging words." Before the exchange could became physical, McDowell broke it up and Gardner went back into her house.

15

{¶ 23}  After Gardner went inside, Jackson and Osborn left and drove back to Osborn's apartment. Approximately ten minutes later, Gardner arrived at Osborn's apartment with several of her friends. Once again, Jackson and Gardner were arguing until McDowell arrived. Gardner and her friends then got into her car and left. Osborn and Jackson got into McDowell's car and rode around with McDowell and Wylie.

{¶ 24}  Wylie testified that in response to Jackson's confrontation with Gardner, McDowell called Nitsche to "talk it out." He indicated that, at first, Nitsche and McDowell were "mad" and were simply "arguing back and forth." By the second call, however, it appeared to Wylie — based on what he heard from McDowell's side of the conversation — that" [t]hey was kind of talking it out for real" and that things no longer seemed "that serious." Wylie testified that after the second call, he believed things had calmed down and that everything was "okay" between McDowell and Nitsche.

{¶ 25}  Osborn testified that when Gardner called her, she informed Osborn that she had thrown out McDowell's belongings and "f***** up" Jackson's car. The group then returned to Osborn's apartment. Wylie testified that by this time, it was in the early morning hours of January 17, 2014. When they arrived, they discovered that McDowell's clothing had been cut up, covered in mustard or mayonnaise and scattered across the yard and street in front of Osborn's apartment building.

{¶ 26}  Jackson testified that she decided to call the police and went inside Osborn's apartment to retrieve her cell phone. Meanwhile, Osborn, Wylie and McDowell began picking up McDowell's clothing and placing it in the trunk of his car. Osborn and Wylie testified that as they were collecting McDowell's belongings, Nitsche walked around the corner of the apartment building, slipped and fell, and then got up and walked toward McDowell. Wylie testified that when he saw Nitsche, he asked him, "you ain't on no bulls***?" Wylie indicated that Nitsche replied that he "ain't on no bull***" and that he just wanted to talk to Jackson. Wylie testified that because he had known Nitsche "since he was a kid," i.e., since Nitsche was 11 or 13, he "put [his] guard down" and continued picking up McDowell's clothing until he heard a"[p]ow." Wylie testified that he heard a single shot. He did not see who fired the shot but stated that when he looked up, he saw McDowell running past him and Nitsche holding a gun, pointing the gun in his face, approximately three to four feet away from him. Wylie testified that, at the time, he did not realize McDowell had been shot. Nitsche tried to squeeze the trigger, but the gun jammed. Wylie then "took off and ran." Wylie testified that he was running with McDowell until McDowell "just started falling."

{¶ 27}  Osborn testified that when Nitsche approached, he told McDowell, "I got to talk to you. I'm not on no bull s * * *." When Nitsche was within arm's length of McDowell, he pulled out a gun and fired a single shot, striking McDowell. She stated that she "seen like little fire came out of the barrel of the gun when he shot [it]." According to Osborn, McDowell and Wylie ran and Nitsche turned the gun on her. He told her, "you better not say nothing or I [will] kill you too," then he ran off through a nearby field in the direction from which he had originally come. Osborn screamed for Jackson. When Jackson came

outside, she and Osborn ran around the corner of the apartment building and found McDowell who had collapsed face first on the ground. Osborn testified that she called 911 but that because they were concerned the paramedics would not arrive in time, she, Jackson and Wylie lifted McDowell up, laid him across the back seat of his car and drove to MetroHealth Hospital. Shortly after he arrived at the emergency room, McDowell was pronounced dead. Cuyahoga County medical examiner Dr. Thomas Gilson testified that McDowell died as a result of blood loss from a gunshot wound to the chest.

{¶ 28} Patrol Officer Mark Maguth with the Cleveland Police Department was dispatched to MetroHealth Hospital to investigate the shooting. He testified that when he arrived at the hospital, McDowell was not breathing and doctors were attempting to resuscitate him. McDowell died before Officer Maguth could speak with him. Osborn spoke with Officer Maguth at the hospital and told him that Nitsche had shot McDowell. Later that morning, she gave a written statement to homicide detectives in which she again identified "Yellow" as the shooter. Osborn testified that she told the police she had known "Yellow" for"[a] few years" and that she knew his "real name" as "Nitsche Luis." She also identified Nitsche in court as the person who had shot McDowell.

{¶ 29} Wylie gave a similar statement to the police, informing them that Nitsche had shot and killed McDowell, and identified Nitsche in court as the person who shot McDowell. Jackson also gave a statement to police. She testified that she did not see who shot McDowell.

{¶ 30} James Raynard, a crime scene technician and Thomas Armelli, a homicide detective, both with the Cleveland Police Department, testified that when they went to the crime scene shortly after McDowell had been shot, they recovered a fired bullet pellet consistent with 9 mm ammunition. Detective Armelli testified that the police were unable to determine whether the bullet recovered at the scene of the McDowell shooting was fired from the same gun as the shell casing recovered at the scene of the Dean shooting. Nitsche was arrested on January 18, 2014.

{¶ 31} Yolanda Goodwin, a "mutual friend" of Jackson, Osborn, Wylie, McDowell and Nitsche, testified that before McDowell was shot, Nitsche had told her that he and Jackson were "together" and that Jackson was pregnant. She testified that she also spoke with Nitsche "right after the shooting" and that Nitsche then told her that he had shot McDowell and that he had also tried to shoot Osborn but that the gun jammed. Goodwin stated that when she first spoke with Nitsche on the morning of January 17, 2014, Nitsche did not know whether McDowell was dead or alive.

{¶ 32} Goodwin testified that after she spoke with Nitsche, she spoke with Jackson. Goodwin testified that Jackson had told her what had happened to McDowell. After speaking with Jackson, Goodwin called Nitsche and spoke with him a second time about the killing. Goodwin gave a written statement to police nine months later, in October 2014.

{¶ 33} No gun was recovered that could be linked to the shootings of McDowell or Dean. No hoodie was recovered that matched the description of the one Nitsche was wearing at the time of the shootings. Lisa Moore, a DNA analyst with the Cuyahoga County Medical Examiner's Office and Curtiss Jones, supervisor of its trace evidence department, testified that human blood was found on the tread of one of the boots Nitsche was wearing at the time of his arrest. However, no DNA evidence, gun shot residue, fingerprint evidence or any other physical evidence was recovered connecting Nitsche to the crime scenes near 2768 Loop Drive or 8201 Madison Avenue or the shootings of Dean or McDowell.

*State v. Nitsche*, *supra,* 2016-Ohio-3170 at ¶¶ 5-33.  In a habeas corpus proceeding, factual determinations made by state courts are presumed correct unless the petitioner rebuts them by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see also *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).

## IV.    Legal Standards

### A.    AEDPA

A state habeas prisoner's claims for habeas corpus relief are governed by the Antiterrorism and Effective Death Penalty Act, *Pub. L. 104-132, 110 Stat. 1214* ("AEDPA"), which amended the habeas corpus statute by including a standard of review that gives significant deference to the decisions made by the state courts on the constitutional issues raised in a habeas corpus petition.[5] *See Penry v. Johnson*, 532 U.S. 782, 791, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir.2008).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279,(2002) (per curiam).

---

[5] Petitions for habeas corpus relief under AEDPA are governed by the statute of limitations set forth in 28 U.S.C. § 2254.  A review of Nitsche's state court record reveals his petition was timely filed.  Because Respondent raises no timeliness issue, I find it unnecessary to set forth a statute of limitations analysis in this report.

When the claim presented in a habeas corpus petition *has* been presented to and decided on the merits by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In applying this statute, the Supreme Court has held that" [t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one."  To obtain habeas corpus relief, a petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Bobby v. Dixon*, 565 U.S. 23, 24, 132 S. Ct. 26, 181 L. Ed. 2d 328 (2011), quoting *Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).  This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. at 102-103 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 50, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment)).  In short,"[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.*, quoting

*Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). "The

question under AEDPA is not whether a federal court believes the state court's determination

was incorrect but whether that determination was unreasonable – a substantially higher

threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

### B.    Cognizability

To the extent that claims asserted in a federal habeas petition allege purely state-law

violations, they are not cognizable on federal habeas review and must be dismissed on that basis

unless the state court ruling violates a fundamental federal constitutional right. "It is not the

province of a federal habeas court to reexamine state-court determinations on state-law

questions.  In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*,

502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780

(1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456

U.S. 107, 121 n. 21 (1982) ("We have long recognized that a 'mere error of state law' is not a

denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct

appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v.

Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal habeas court does

not function as an additional state appellate court reviewing state courts' decisions on state law

or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

However, state-court rulings on issues of state law may rise to the level of due process

violations if they" 'offend[] some principle of justice so rooted in the traditions and conscience

of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.

2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious

that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th

Cir. 2003).  Fundamental fairness under the Due Process Clause is compromised when "the

action complained of . . . violates those 'fundamental conceptions of justice which lie at the base

of our civil and political institutions,' . . . and which define 'the community's sense of fair play

and decency.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted).

Courts, therefore, "have defined the category of infractions that violate 'fundamental fairness'

very narrowly."  *Id.*

> ### C.  Exhaustion and Procedural Default

When a habeas petitioner presents a federal law ground for relief that ***has not*** been

presented to and decided on the merits by the highest state court that could pass upon such a

claim, the federal court must make a close examination of the record to find out why the review

did not occur.  In almost every circumstance, federal courts may neither review such claims on

the merits nor grant habeas relief in regard to such claims.

AEDPA provides a way for state prisoners who are being held in custody in violation of

federal law – the constitution or laws or treaties of the United States – to apply to the federal

courts for a writ of habeas corpus. 28 U.S.C. §2254(a).  In recognition of the equal obligation of

the state courts to protect the constitutional rights of criminal defendants, and in order to prevent

needless friction between the state and federal courts, a state criminal defendant with *federal*

constitutional claims must present those claims to the state courts for consideration before

becoming eligible for habeas corpus relief.  28 U.S.C. §2254(b), (c).  If he fails to do so, but still

has an avenue open to him by which he may present his claims, then his petition is subject to

dismissal for failure to exhaust state remedies.  *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275-78, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971)).  But when a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas . . .." *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

The term "procedural default" has come to describe the situation in which a person convicted of a crime in a state court fails (for whatever reason) to present a particular federal claim to the highest court of the state so that the state has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process.  This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts *a fair opportunity to rule on the federal law claims* being asserted.  Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).[6]

---

[6] Federal habeas courts review a petitioner's state-court briefs to determine whether he or she fairly presented a claim as a federal constitutional claim, examining the petitioner's: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)).

22

In addition to the requirement that a habeas petitioner's claims must have been fairly presented in state court as federal law claims, the claims also must be presented in compliance with state procedural rules and requirements.  If the habeas petitioner's federal law claims are not presented to the state courts in the manner state law requires, and if the state courts have not decided the federal claims on their merits as a result, then neither may a federal court do so.  In the words used by the United States Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case-that is, they are "procedurally defaulted."

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule."  *Id.*  Second, the Court must determine whether the state courts actually enforced the state procedural sanction.  *Id.*  Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim.  *Id.*  Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error.  *Id.*  This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level.  *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).  Turning to the fourth part of the

*Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986).

If, after considering all four factors of the *Maupin* test, the court concludes that a procedural default has occurred, it is barred from considering the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495-96, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).

## V.   Discussion

### A.   Ground One

Nitsche's Ground One claim asserts that he was subjected to unconstitutional double jeopardy when he was sentenced to serve multiple prison terms for firearm specifications attached to the attempted murder and aggravated robbery charges arising from the incident involving Berry Dean.  He also alleges these sentences were imposed in violation of Ohio Rev. Code § 2929.14(B)(1)(b).  ECF Doc. 4 at 7.

Warden Erdos argues there are two fatal flaws in this claim.  First, he points out that to the extent Nitsche bases his claim on an alleged violation of state law, he cannot raise that argument here because federal habeas proceedings are only available to remedy federal law errors.  Second, Erdos contends the claim must be dismissed because Nitsche never presented it as a federal law claim in his state court proceedings, and, thus, never fairly presented it in such a way that the courts of Ohio could remedy any alleged constitutional violation.

24

Warden Erdos's arguments have merit.  First, a review of Nitsche's direct appeal briefs –
in which he complained about the imposition of separate sentences on two of the firearm
specifications on which he was convicted – reveals no mention of any federal law.  *See generally*
ECF Doc. 11-1 at 86-87, 197.  And the Ohio Court of Appeals never mentioned any federal law
in its review of Nitsche's appeal of his firearm specification sentences.  *State v. Nitsche*,
Cuyahoga App. No. 103174, 2016-Ohio-3170, at ¶¶ 50-55.  Thus, Nitsche did not fairly present a
federal double jeopardy claim in state court; the Ohio courts were never given the chance to
review a Double Jeopardy Clause argument; and the claim was never exhausted.  Because
Nitsche cannot now present the claim in the Ohio courts, it has been procedurally defaulted.  In
*Hodges v. Coulson*, 727 F.3d 517, 529-530 (6th Cir. 2013), the Sixth Circuit restated the
standard this court is obligated to follow in deciding this issue:

> "[S]tate prisoners must give the state courts one full opportunity to resolve any
> constitutional issues by invoking one complete round of the State's established
> appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct.
> 1728, 144 L. Ed. 2d 1 (1999). When a petitioner has failed to present the grounds
> to the state courts and no state remedy remains available, his grounds are
> procedurally defaulted. *Id*. at 847-48."  [T]he exhaustion doctrine requires the
> petitioner to present the same claim under the same theory to the state courts
> before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552-53
> (6th Cir. 2004) (internal quotation marks omitted). The petitioner will not be
> allowed to present claims never before presented in the state courts unless he can
> show cause to excuse his failure to present the claims and actual prejudice to his
> defense at trial or on appeal. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct.
> 2546, 115 L. Ed. 2d 640 (1991). The only exception is if review is needed to
> prevent a fundamental miscarriage of justice, such as when the petitioner submits
> new evidence showing that a constitutional violation has probably resulted in a
> conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 495-
> 96, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986).

Nitsche has not filed a traverse, so he has not responded to the warden's procedural
default argument.  He has never attempted to show cause for his failure to raise his Ground One
claim in state court.  To the contrary, Nitsche's petition asserts he did raise the issue.  ECF Doc.

4 at 7.  Nitsche's confusion is understandable.  Probably, in his mind, the crux of his claim is that he was wrongly sentenced on two firearm specifications arising from the same incident.  And he did raise a claim related to that issue in his direct appeal.  *Id.* at 2.  But, the only issue Nitsche raised in state court was his claim that the consecutive firearm sentences were imposed in violation of Ohio law.  For the reasons stated above, that was not enough; Nitsche needed to raise the issue as a federal constitutional law issue.

The Sixth Circuit's holding in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), requires us to evaluate any explanation by Nitsche as to what caused him not to raise his double jeopardy issue in state court.  Here, we have no explanation to evaluate.  If Nitsche *would have* argued that his direct appeal lawyer did an ineffective job representing him on appeal because he failed to raise the federal Double Jeopardy Clause argument on appeal, that argument *might* have provided cause to potentially excuse his failure to raise the issue, assuming he could also show that he was prejudiced by that failure.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991).  But here, that argument would also fail because the ineffective assistance of appellate counsel claim must itself have been fairly presented in state court.  Nitsche filed a motion to reopen his direct appeal under Ohio App. R. 26(B) in order to assert that his appellate counsel was ineffective.  ECF Doc. 11-1 at 238.  But none of the assignments of error in that application related to his argument that the imposition of separate sentences for firearm specifications violated the Double Jeopardy Clause.[7]  Two reasons prevent Nitsche from now returning to the Ohio Court of Appeals to assert an additional ineffective

---

[7] The closest argument to the Ground One double jeopardy claim in the Rule 26(B) application was Assignment of Error VII, which asserted that Nitsche's appellate counsel was ineffective for not raising a direct appeal assignment of error alleging the impropriety of the trial court's imposition of separate sentences for the allegedly allied offenses of attempted murder, aggravated robbery and felonious assault from the Berry Dean incident.  *Id.* at 247.

26

assistance of appellate counsel claim: first, one cannot pursue a second Ohio App. R. 26(B) application; and, second, *res judicata* would prevent the relitigation of the issue of ineffective assistance of appellate counsel.  *State v. Twyford*, 106 Ohio St.3d 176, 176-177, 2005-Ohio-4380, 833 N.E.2d 289; *Twyford v. Bradshaw*, No. 2:03cv906, 2007 U.S. Dist. LEXIS 158759, *41 (S.D. Ohio Sept 27, 2017).

Absent a showing of cause for Nitsche's failure to pursue his Ground One double jeopardy claim in state court, we are not obligated to assess whether he suffered any prejudice from the failure to assert the alleged double jeopardy violation.  Further, this is not a case in which the procedural default of the Ground One claim should be excused "to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent."  *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013).  Nitsche has not come forward with any evidence to show he is actually innocent of the charges related to the Berry Dean incident.  Nor has Nitsche proffered clear and convincing evidence to rebut the jury's verdicts or the Ohio Court of Appeals finding that there was sufficient evidence to find him guilty of the attempted murder and aggravated robbery of Berry Dean.  And to the extent Nitsche asks us to review the Ohio courts' determination that consecutive sentences should not have been imposed under Ohio law, we are powerless to do so.  For the reasons discussed at pages 20-21 above, our court lacks authority to consider purely state law claims in a habeas petition; they are noncognizable.

Because Nitsche's Ground One claim was procedurally defaulted and, in part, appears to assert a noncognizable, alleged misapplication of state law, it should be dismissed.

**B.**      **Ground Three**

Nitsche's Ground Three claim should be dismissed for the same reasons.  Ground Three asserts that the trial court violated Nitsche's rights when it considered his alleged gang affiliation when sentencing him.  He bases this argument on his contention that none of the offenses of which he was convicted had gang implications.  Warden Erdos asserts the same argument concerning non-cognizability and procedural default that he argued in response to Nitsche's Ground One claim.  Specifically, respondent contends Nitsche never mentioned federal law at all in his state court challenges to the trial court's consideration of his alleged gang affiliation at sentencing.  Thus, any federal claim was procedurally defaulted because it was never fairly presented for state court consideration.  And, to the extent Nitsche only argues that a violation of state law occurred, the warden argues that the claim is noncognizable in federal habeas proceedings.

Although Nitsche raised this claim in state court, as with his Ground One claim, he never argued or presented it as a violation of his federal law rights.  ECF Doc. 11-1 at 89-91, 199-200. Instead, Nitsche asserted that the trial court abused its discretion.  *Id.* at 91, 200.  Initially, I note that the Ohio Court of Appeals ruled that Ohio law precluded it from reviewing Nitsche's aggravated murder sentence.  *State v. Nitsche*, Cuyahoga App. No. 103174, 2016-Ohio-3170, ¶¶ 66-67.  The court further noted that Nitsche did not cite any authority for the proposition that the trial court erred in considering his gang affiliation when sentencing him on the murder charge. *Id.* at ¶ 68.  And, referring only to Ohio law, the court found no error in the consideration of the gang connection and concluded the sentence was proper because it was authorized within the statutory range.  *Id.* at ¶¶ 69-70.

Nitsche's habeas petition also makes no mention of federal law in Ground Three. It is apparent that he has procedurally defaulted the claim by not fairly presenting it as a federal law claim in state court – assuming he had any federal law basis in mind when asserting Ground Three. Nitsche never exhausted any federal claim he may have had concerning this issue, and he procedurally defaulted the claim because there is no way for him to present that issue now. *Rose v. Lundy*, 455 U.S. 509, 518-520. As with his Ground One claim, Nitsche has offered no cause explanation for why he did not assert his Ground Three claim as a federal law violation in state court. We, therefore, have no basis on which to conclude that he has shown cause for his failure to fairly present the issue and we need not address the issue of prejudice. As with the Ground One claim, Nitsche has procedurally defaulted any claim that his appellate counsel was ineffective for not asserting this claim on direct review; Nitsche made no mention of this claim in his application to reopen his direct appeal under Ohio App. R. 26(B). For the reasons stated at pages 27-28 *supra*, Nitsche can present no such claim now. Finally, as with the Ground One claim, the Ground Three claim presents only an issue of state law: whether the trial judge abused her discretion. Such claims are noncognizable in a federal habeas case.

Because Nitsche has procedurally defaulted his Ground Three claim; has no excuse for his default; does not claim to be actually innocent of the aggravated murder of Lawelden McDowell; and because the Ground Three claim raises only a noncognizable issue of state law, I recommend it be dismissed.

### C.    Ground Two

In his Ground Two claim, Nitsche argues that the trial court's alleged failure to consider his young age and its imposition of a sentence of life imprisonment without the possibility of parole violated his right under the *Eighth Amendment* to the U.S. Constitution to not be subjected

to cruel and unusual punishment.  U.S. CONST. amend. VIII.  Warden Erdos argues that the Ohio

Court of Appeals' consideration of Nitsche's *Eighth Amendment* claim was neither contrary to

nor an unreasonable application of clearly established federal law.  The warden also argues that

the factual differences between Nitsche's case and the Supreme Court cases Nitsche relied on

negate any argument that the Ohio courts made an unreasonable determination of the facts in a

factually indistinguishable setting.  Because the Ohio courts have ruled on the merits of the

claim, I conclude it was exhausted and is now eligible for our merits review.

Habeas courts "begin by asking which is the last *explained* state-court judgment on the

[constitutional] claim."  *Ylst v. Nunnemaker*, 501 U.S. 797, 805, 111 S.Ct. 2590, 115 L.Ed.2d

706 (1991).  The starting point of our analysis is the Ohio Court of Appeals decision because the

Ohio Supreme Court judgment denying review on Nitsche's direct appeal contained no

explanation of the decision.  Under AEDPA, it is the last-explained decision which must be

analyzed to determine whether it was contrary to, or an unreasonable application of, clearly

established federal law.

This court's task is not to decide Nitsche's *Eighth Amendment* claim anew without regard

to the decisions of the Ohio courts.  AEDPA imposes a standard of review that gives significant

deference to state court decisions on constitutional issues on the presumption that the state courts

are fully capable of protecting the federal constitutional rights of state court defendants.  *Lindh v.*

*Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).  When

federal claims have been decided on the merits in state court, federal habeas courts may not grant

relief unless the state court decision was "contrary to, or involved an unreasonable application, of

clearly established federal law as determined by the Supreme Court of the United States; or

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented."  28 U.S.C. § 2254(d).  Thus, our job is to examine how the Ohio courts

applied U.S. Supreme Court precedent in deciding Nitsche's *Eighth Amendment* claim.  Only if

that analysis was contrary to or unreasonably applied Supreme Court precedent may habeas

relief be granted.

First, we must examine Nitsche's claim.  He contends a sentence of life imprisonment

without the possibility of parole for a person of his age – he was 23 at the time of the offense –

constitutes cruel and unusual punishment, something the *Eighth Amendment* forbids.  Nitsche

cites *Roper v. Simmons*, 543 U.S. 551 (2005), in support of his claim.  Nitsche's state court briefs

also relied on *Roper*, the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460, 132

S.Ct. 2455, 183 L.Ed.2d 407 (2012), and the Ohio Supreme Court's decision in *State v. Long*,

138 Ohio St.3d 478 (2014).  The Ohio Court of Appeals discussed how these cases, as well as

the Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d

825 (2010), were to be applied in Nitsche's case.

Second, we must examine how the Ohio Court of Appeals analyzed Nitsche's *Eighth*

*Amendment* claim.  That court stated:

{¶ 57}  Nitsche's constitutional challenge to his life sentence without parole on the
aggravated murder count is based on *Miller v. Alabama*, 567 U.S. [460], 132 S.Ct. 2455,
183 L.Ed.2d 407 (2012), *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1
(2012), and *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890.

{¶ 58}  In *Miller*, the United States Supreme Court held that a sentencing scheme that
mandates a sentence of life in prison without the possibility of parole for a juvenile
homicide offender violates the *Eighth Amendment's* prohibition on cruel and unusual
punishment. *Miller* at 2464. In *Roper*, the United States Supreme Court held that the
*Eighth* and *Fourteenth Amendments* prohibit imposition of the death penalty on offenders
who were under the age of 18 when their crimes were committed. *Roper* at 578. In *Long*,
the Ohio Supreme Court held that a trial court, in exercising its sentencing discretion for
aggravated murder under R.C. 2929.03(A), "must separately consider the youth of a
juvenile offender as a mitigating factor before imposing a sentence of life without parole"
and that "[t]he record must reflect that the court specifically considered the juvenile

offender's youth as a mitigating factor at sentencing when a prison term of life without parole is imposed." *Long* at paragraphs one and two of the syllabus.

{¶ 59} Nitsche asserts that the same considerations that led the courts in these cases to conclude that juveniles "'are less deserving of the most severe punishments,'" *Miller* at 2464, quoting *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L.Ed.2d 825 (2010), should be applied to Nitsche, a "young adult * * * 'raised' dysfunctionally in America's urban cores." We disagree.

{¶ 60} As the United States Supreme Court explained in *Miller*, juveniles are "constitutionally different from adults for purposes of sentencing":

> First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S. at 569, 125 S.Ct. 1183, 161 L.Ed.2d 1. Second, children "are more vulnerable * * * to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. Ibid. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.* at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1. * * * [T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. * * * [I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. * * *

*Miller* at 2464-2468. The Ohio Supreme Court relied on *Miller* in reaching its decision in *Long*. *Long* at ¶ 1, 11-14.

{¶ 61} Nitsche, however, is not a "juvenile offender." He was 23 years of age and had been an adult for five years at the time he committed the crimes at issue. Therefore, the considerations identified in *Miller* (and the other cases cited above) — which are based on the "significant gaps between juveniles and adults," *Miller* at 2464 — do not apply here.

{¶ 62} The Tenth District recently considered a similar argument in *State v. Phipps*, 10th Dist. Franklin No. 15AP-524, 2016-Ohio-663. In that case, the defendant — who was 19 at the time he committed the offenses at issue — pled guilty to 21 counts, including aggravated robbery and kidnapping, arising out of a series of robberies, burglaries and home invasions. *Id.* at ¶ 3, 35. He was sentenced to an aggregate prison term of 150 years. *Id.* at ¶ 3. The defendant argued, based on *Miller*, *Graham* and *Roper*, that the trial court erred in failing to consider his "relative youth" as a relevant factor under R.C. 2929.12 and that his youth should have been considered during sentencing because "he lacked * * * maturity and had an underdeveloped sense of responsibility." *Id.* at ¶ 33, 35. The

Tenth District rejected the defendant's argument, noting that there was no authority to support the extension of *Roper*, *Graham* and *Miller* to the defendant, who was not a juvenile at the time he committed the offenses at issue. Id. at ¶ 37, 39. As the court explained:

> We are unaware of, and appellant fails to point to, any pertinent legal authority to support the extension of *Roper*, *Graham*, and *Miller* to persons who were not juveniles at the time of the commission of the offense. * * * [I]n *Roper*, *Graham*, and *Miller*, the United States Supreme Court explicitly referred to the age of 18 as the divide between juveniles and adults when considering developmental differences under the *Eighth Amendment*. * * * The United States Supreme Court explained its use of the age of 18 to establish the divide as follows:
> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. * * * The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.
>
> *Roper* at 574.
>
> Following *Miller*, the Sixth Circuit considered whether to extend *Miller* to persons over the age of 18. *United States v. Marshall*, 736 F.3d 492 (6th Cir. 2013). The court found that" [c]onsiderations of efficiency and certainty require a bright line separating adults from juveniles" and that "[f]or purposes of the *Eighth Amendment*, an individual's eighteenth birthday marks that bright line." *Id.* at 500. * * *
>
> [O]n the facts of this case, we cannot agree that the trial court erred by refusing to consider appellant's age through extension of the holdings in *Roper*, *Graham*, and *Miller* in the determination of his sentence.

*Phipps* at ¶ 37-40; *see also State v. Rolland*, 7th Dist. Mahoning No. 12 MA 68, 2013-Ohio-2950, ¶ 15 ("*Roper*, *Graham* and *Miller* are inapplicable" to a defendant who was not a juvenile at the time of the commission of the offense because the protections at issue in those cases "apply only to juvenile offenders.")

{¶ 63} Like the defendant in *Phipps*, Nitsche "offers no persuasive justification for the extension of the reasoning" in *Roper*, *Miller* and *Long* to the facts of this case. *Id.* at ¶ 39. Although this case involves a sentence of life without the possibility of parole rather than a lengthy aggregate prison sentence, we believe the same reasoning applies. Nitsche's sentence of life imprisonment without the possibility of parole does not violate the *Eighth Amendment's* prohibition against cruel and unusual punishment.

33

{¶ 64} Furthermore, even if the trial court was constitutionally required to consider Nitsche's age prior to sentencing him to life without parole, the transcript from the sentencing hearing reflects that it did so. The trial court specifically noted during the sentencing hearing that "at the defendant's young age of now 25 he had already several prior criminal convictions." Specifically, the court found that the appellant was convicted in 2011 for domestic violence and attempted abduction and was sentenced to a 12—month prison term; in 2009 he was sentenced to a two year term of imprisonment for receiving stolen property of a motor vehicle and failure to comply with an order signal of a police officer, and in 2008, after violating the terms of probation for a charge of trafficking controlled substance, he was sentenced to a term of six months. Accordingly, Nitsche's third assignment of error is overruled.

*State v. Nitsche*, *supra,* 2016-Ohio-3170 at ¶¶ 57-64.

Two things are immediately apparent from the Ohio Court of Appeals' treatment of Nitsche's *Eighth Amendment* claim: first, it concluded that the Supreme Court decisions in *Miller*, *Roper* and *Graham* did not apply to Nitsche's case because those cases all dealt with limitations on sentencing juvenile offenders – people under 18 years old – and Nitsche was five years removed from his eighteenth birthday when Lawelden McDowell was murdered. Second, it declined to extend *Miller*, *Roper* and *Graham* to someone Nitsche's age based on an argument that twenty-three-year-old individuals, like juveniles, are not fully mature adults. The Sixth Circuit reached the same conclusion in *United States v. Marshall*, 736 F.3d 492, 498 (6th Cir. 2013) ("the reasons for according special protections to offenders under 18 cannot be used to extend those same protections to offenders over 18.")

Nitsche's Ground Two claim can be disposed of on the basis that the Supreme Court has never clearly established as a matter of federal law that that the *Eighth Amendment* is violated when a person in his early twenties is sentenced to life imprisonment with no parole eligibility. Nitsche cannot point to any Supreme Court decision to that effect because there is no such decision. Absent clearly established federal law on the issue, this habeas court need not apply

AEDPA to determine whether the Ohio Court of Appeals decision was contrary to or an unreasonable application of such law.  *Carey v. Musladin*, 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). "[The] threshold question of whether the relevant law is clearly established can be dispositive: a state court's decision cannot be contrary to or an unreasonable application of clearly established federal law if there is no clearly established federal law.  *See Musladin*, 549 U.S. at 77."  *Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017).  I recommend Nitsche's Ground Two *Eighth Amendment* claim be denied on this basis.

Nitsche's state court briefs argued for an extension of *Miller* to the facts of this case.  The Sixth Circuit's analysis in *Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012), plainly shows that extending clearly established federal law to different factual circumstances is not the province of the habeas court.  In *Bunch*, the habeas petitioner had been convicted of multiple non-homicide offenses and was sentenced to serve consecutive sentences totaling 89 years.  He argued that the Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48 (2010)[8] – which clearly established that the imposition of life-without-parole sentences on minors convicted of non-homicide offenses violated the *Eighth Amendment* – should be extended to his situation.  The Sixth Circuit affirmed this Court's conclusion that a state court's imposition of consecutive sentences totaling 89 years upon a non-homicide juvenile offender did not violate the *Eighth Amendment* because there was no clearly established federal law determined by the Supreme Court on that issue.

Nitsche also argues, however, that the trial court violated his *Eight Amendment* rights by imposing a life-without-parole sentence upon him without at least considering his young age.  And he argued – in his state court briefs – that the reasoning in *Miller v. Alabama*, 567 U.S. 460

---

[8] *Graham v. Florida* was not decided until after Bunch was sentenced in state court; but the Sixth Circuit concluded that even if *Graham* had been on the books at a relevant time, it did not clearly establish the proposition for which Petitioner Bunch offered it.

(2012), should be extended to the facts in this case.  *Miller* clearly established that mandatory life-without-parole sentences for juvenile homicide offenders violate the *Eighth Amendment* because the trial court was not able to consider issues suggesting that the youthful offender was less culpable than an adult who committed the same offense.  For the reasons stated above, Nitsche's assertion that a Supreme Court holding should be "extended" evidences the absence of clearly established authority supporting his claim.  I recommend this Court take the same approach it took in *Bunch* and decline the implied invitation to make new law on Nitsche's behalf.  *Bunch*, 685 F.3d at 649.  Nitsche is essentially asking us to do what the Sixth Circuit refused to do in *United States v. Marshall*, 736 F.3d 492 (6th Cir. 2013): to extend *Miller* to a person over 18.  We have no basis upon which to do so.

More fundamentally, I note that the factual predicate for Nitsche's "my age should have been considered" argument is absent, because the Ohio Court of Appeals found that the trial court *did* consider Nitsche's age.  *State v. Nitsche*, *supra,* 2016-Ohio-3170 at ¶ 64.  Factual findings by the state court are presumed correct unless the habeas petitioner rebuts them by clear and convincing evidence, something Nitsche has not attempted to do.  28 U.S.C. § 2254(e)(1).  Thus, Nitsche's argument that *Miller* should be extended to require a sentencing court to consider the relative youth of the offender before imposing a life-without-parole sentence fails on the record before us, and I recommend that his Ground Two claim be dismissed on that further ground.

The ultimate issue before us on Nitsche's Ground Two claim is whether the Ohio Court of Appeals issued a decision that was contrary to or an unreasonable application of clearly established federal law.  Here, the state appellate court concluded that the *Miller*, *Roper*, and *Graham* decisions were irrelevant to Nitsche's case because they all dealt with restrictions on the

36

sentencing of juvenile offenders and Nitsche was not a juvenile.  In other words, the state court expressly declined to extend the clear holdings of those cases to Nitsche's situation.  As Warden Erdos points out, the Supreme Court has stated, "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. *White v. Woodall*, 572 U.S. 415, 426, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014).  And while it is true that the state courts must "reasonably apply the rules squarely established by [the Supreme Court's] holdings to the facts of each case" and not merely dispose of claims when not confronting "an identical fact pattern," the "critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question, *Harrington [v. Richter]*, 562 U.S., at 103, 131 S. Ct. 770, 178 L. Ed. 2d 624, 641." *White*, 572 U.S. at 427.

I conclude that the Ohio Court of Appeals did not unreasonably decline to apply the Supreme Court's jurisprudence restricting the manner in which juveniles can be sentenced to Nitsche's case.  The state court could not be faulted for deciding it had no basis to do what the Sixth Circuit declined to do in *Marshall*.  And it is certainly not "so obvious" that the rules of *Miller*, *Roper* and *Graham* should be extended to twenty-three-year olds' cases that relief could be available to Nitsche.  Thus, even if there was a basis to conclude that the trial court failed to consider Nitsche's age – and there is not – Nitsche is not entitled to habeas relief on his Ground Two claim.  Ground Two should be dismissed.

**D.  Ground Four**

**1.  Procedural Default**

Nitsche's Ground Four claim alleges the trial court abused its discretion in overruling his motion to sever the trial of the indictment counts related to the Lawelden McDowell and Berry Dean incidents.  Warden Erdos argues the Ground Four claim was procedurally defaulted when Nitsche failed to renew his objection to a joint trial at the close of the evidence at trial.  Even if not procedurally defaulted, Erdos contends the claim lacks merit under AEDPA.

The state court record reflects Nitsche moved for separate trials of these counts in a motion filed on November 26, 2016.  ECF Doc. 11-1 at 13.  The state opposed the motion.  ECF Doc. 11-1 at 18.  The trial court overruled the motion on February 6, 2015.  ECF Doc. 11-1 at 31. When Nitsche got new counsel, they moved to reconsider the denial of the motion to sever, couching the issue as a violation of Nitsche's state and federal due process rights.  ECF Doc. 11-1 at 32.  The trial court denied the motion to reconsider on May 18, 2015.  ECF Doc. 11-1 at 34. Defense counsel did not renew the motion to sever at the close of the state's case or at the close of all the evidence.  *State v. Nitsche, supra,* 2016-Ohio-3170 at ¶ 90.

It is apparent that Nitsche consistently raised the claim that he could not get a fair trial if he was tried on the two shooting incidents at the same trial.  He did so in his motion to sever, in his motion to reconsider the trial court's denial of his motion to sever, in his direct appeal and in his attempt to obtain Ohio Supreme Court review of his direct appeal.  He did not, however, raise the joint trial issue in his Ohio App. R. 26(B) application to reopen his direct appeal.  Thus, he has never asserted that his trial or direct appeal counsel were ineffective in regard to their handling of the joint trial issue.

In all of Nitsche's filings concerning the joint trial issue he made only a single, cursory reference to federal law: in his motion to reconsider the trial court's initial ruling denying the motion to sever.  ECF Doc. 11-1 at 34.  Nitsche's briefs cited no federal cases and no clearly established – or any other – federal law announced by the United States Supreme Court.  Warden Erdos has not, however, argued that Nitsche's Ground Four claim was procedurally defaulted by virtue of having never been fairly presented to the state courts as a federal constitutional claim.  Instead, the warden's procedural default argument centers upon a claim that Nitsche failed to renew his motion to sever at the close of the evidentiary segments of the trial.  That argument is supported by the following statements of the Ohio Court of Appeals:

> {¶ 90} This court normally reviews a trial court's decision on joinder for an abuse of discretion. *State v. Banks*, 8th Dist. Cuyahoga, 2015-Ohio-5413, ¶ 64, 56 N.E.3d 289, citing *State v. Grimes*, 8th Dist. Cuyahoga No. 94827, 2011-Ohio-4406, ¶ 15. However, where a defendant fails to renew a Crim. R. 14 motion for severance either at the close of the state's case or the close of all evidence "'waives all but plain error on appeal.'" *Lyndhurst v. Smith*, 8th Dist. Cuyahoga No. 101019, 2015-Ohio-2512, ¶ 32, quoting *State v. Howard*, 3d Dist. Marion No. 9-10-50, 2011-Ohio-3524, ¶ 82; see also *State v. Ferren*, 8th Dist. Cuyahoga No. 95094, 2011-Ohio-3382, ¶ 34. The record before us does not indicate that Nitsche renewed his motion to sever at the close of the state's case or the close of all evidence. Accordingly, he has waived all but plain error.

> {¶ 91}   To demonstrate plain error, the defendant must show "an error, i.e., a deviation from a legal rule" that was "an 'obvious' defect in the trial proceedings," and that the error "affected a substantial right," i.e., a "reasonable probability" that the error resulted in prejudice, affecting the outcome of the trial. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002 Ohio 68, 759 N.E.2d 1240 (2002). "We recognize plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Lyndhurst*, 2015-Ohio-2512, at ¶ 32, quoting *State v. Landrum*, 53 Ohio St.3d 107, 110, 559 N.E.2d 710 (1990).

> * * *

> {¶ 99}  We find no error, plain or otherwise, in the trial court's denial of Nitsche's motion to sever. Accordingly, Nitsche's sixth assignment of error is overruled.

*State v. Nitsche, supra,* 2016-Ohio-3170 at ¶¶ 90-91, 99.  The court's conclusion that Nitsche

had waived all but plain error signified: (i) that the court of appeals was enforcing Ohio's

procedural requirement that motions to for separate trials under Ohio Criminal Rule 14 be

renewed at the close of the evidence or be waived; (ii) that Nitsche had waived his argument that

he could not get a fair trial if his entire case was tried at the same time; and (iii) Nitsche could

only be granted relief if he could plainly show he had suffered the deprivation of a substantial

right and had suffered prejudice as a result.  Only plain errors resulting in a manifest miscarriage

of justice could be remedied.

When, as here, a state court disposes of a claim on the basis of a procedural bar, we must

apply the cause and prejudice analysis from *Maupin v. Smith*, as discussed above, to determine

whether habeas review is precluded.  First, it is apparent that the Ohio Court of Appeals both

announced the existence of the procedural requirement that a motion to sever under Ohio Crim.

R. 14 must be renewed or be waived and enforced that requirement by limiting its analysis of

Nitsche's sixth assignment of error on direct appeal to plain error review.  Second, the Sixth

Circuit has frequently stated that state court plain error review of a petitioner's claims does not

prevent the enforcement of the procedural bar from being both an adequate and independent

basis upon which a claim can be disposed of.  *See, e.g., Scott v. Mitchell*, 209 F.3d 854, 867-68

(6th Cir. 2000); *Awkal v. Mitchell*, 613 F.3d 629, 648-49 (6th Cir. 2010), cert. denied, 562 U.S.

1183 (2011); *White v. Mitchell*, 431 F.3d 415, 423 (6th Cir. 2005), cert. denied 549 U.S. 1047

(2006).  When a state court announces that it has applied only plain error review but also sets

forth what seems to be a merits analysis, "the state court has made it sufficiently clear that its

decision was based on an 'adequate and independent state ground that precluded federal

review.'"  *Seymour v. Walker*, 224 F.3d. 542, 555, n. 5 (6th Cir. 2000), citing *Harris v. Reed*, 489 U.S. 255 (1989).

Here, the Ohio Court of Appeals rejected Nitsche's sixth assignment of error on direct appeal, finding no plain or other error, after it concluded he had waived his right to merit review by not timely renewing his motion to sever.  But it also found Nitsche suffered no prejudice from defending the two incidents in a single trial.  It noted that even if there had been separate trials the jury would have heard the evidence of the two shooting incidents.  Under the state's theory of the case – that Nitsche shot McDowell and Dean because he thought they were involved with his girlfriend – the state likely would have been entitled to prove Nitsche's motive, something permitted under Ohio Evid. R. 404(B).  *State v. Nitsche, supra,* 2016-Ohio-3170 at ¶ 97.  And it found evidence "amply sufficient to sustain each verdict, regardless of whether the offenses were tried together."  *Id*. at ¶ 98 (citations and internal quotation marks omitted).  Thus, the court of appeals concluded there was no basis for finding Nitsche had been denied a fair trial.

Nitsche has not made any arguments to excuse the procedural default of his Ground Four claim. Nothing in his petition explains why his counsel did not renew the motion to sever.  As with his Ground One and Ground Three claims, Nitsche's petition asserts that Ground Four was fully exhausted on the merits.  ECF Doc. 4 at 12.  Nitsche has defaulted any argument that his trial counsel was ineffective: he did not argue such a claim on direct appeal; and he did not assert such an argument on a motion for post-conviction relief.  He also defaulted a claim that his appellate counsel was ineffective (for not arguing that his trial counsel was ineffective on this basis) by not including such a claim in his Ohio App. R. 26(B) application to reopen the direct appeal.  And Nitsche has never contended he was actually innocent of the crimes involving the

41

shootings of Lawelden McDowell and Berry Dean; therefore, there is no basis for excusing Nitsche's procedural default of his Ground Four claim to prevent a manifest injustice.

I recommend Nitsche's Ground Four Claim be dismissed on the ground it has been procedurally defaulted.

### 2.    Lack of Merit

Warden Erdos makes the alternative argument that Nitsche's Ground Four claim could be denied on the merits.  The court is not required to dispose of Nitsche's Ground Four claim on procedural grounds.  When a claim plainly lacks merit, the court has the option to dispose of the claim on the merits.

Nitsche's Ground Four claim hinges on a finding that he was denied a fair trial by having to defend two different shooting incidents in a single trial.  He asserts that, "[t]he [two] incidents were both violent in nature and could have been tried separately.  The jury, by nature, would be much more inclined to believe in the guilt of Petitioner in the second incident after hearing evidence of a shooting in the first incident and vice versa.  The trial court abused its discretion in denying the motion to sever charges and this denied Petitioner a right to a fair trial."  ECF Doc. 4 at 12.

The Ohio Court of Appeals did not overtly evaluate this claim on the merits, but in finding "no error plain or otherwise" the court essentially applied Ohio's standards for determining the propriety of a trial court's refusal to order separate trials under Ohio Crim. R. 14 as if it were conducting a merits review.  First, the court noted that Nitsche made no argument that the charges were misjoined in violation of Ohio Crim. R. 8.[9]  *State v. Nitsche*, *supra*, 2016-Ohio-3170 at ¶ 92.  Next, the court independently found  that "[t]he offenses relating to the

---

[9] Ohio Crim. Rules 8 and 14 are virtually identical to Fed. R. Crim. P. 8 and 14.

shooting of Dean and the shooting of McDowell were charged together because they were of the 'same or similar character' and part of 'a common scheme or plan' or 'course of criminal conduct' occurring over a relatively short period of time," which would make their joinder in the indictment proper under Ohio Crim. R. 8.  *Id.* at ¶ 93.  After pointing out that the jury was instructed to decide each charge separately, the court found:

> There is nothing in the record to suggest that the jury confused the evidence as to the various counts or was improperly "influenced by the cumulative effect of the joinder." [*State v.*] *Banks,* [8th Dist. Cuyahoga,] 2015-Ohio-5413, [56 N.E.3d 289,] *at ¶ 66*. To the contrary, the record demonstrates that the jury considered each offense separately, finding Nitsche not guilty of aggravated robbery in Count 10, while convicting him of the remaining offenses. *See, e.g., id. at ¶ 66-68* (defendant was "unable to show that he was prejudiced by the trial court's refusal to sever his offenses" where he was acquitted of some charges and convicted of a lesser offense in others).

*Id.* at ¶ 95.  The Ohio Court of Appeals found that Nitsche's "bald" assertions of prejudice were insufficient to meet his burden of showing that he had suffered actual prejudice.  *Id.* at ¶ 96.  The appellate court made three final findings: (i) that evidence of both shooting incidents would likely have been admissible in separate trials under Ohio Evid. R. 404(B); (ii) that the evidence pertaining to each incident was "separate and direct;" and (iii) there was ample evidence supporting the jury's verdicts concerning each incident.  *Id.* at ¶¶ 97-98.  Based on its findings, the appellate court rejected Nitsche's argument that he had been denied a fair trial when he was required to defend himself on both the McDowell and Dean shooting incidents.

The Ohio Court of Appeals' decision never mentioned or discussed any "clearly established federal law" in disposing of Nitsche's misjoined trials argument.  However, the standards it applied, as discussed above, closely tracked standards that have been expressed by the United States Supreme Court.  In *United States v. Lane*, 474 U.S. 438, 449 , 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), the Supreme Court held that misjoinder of charges at trial was harmless

error absent actual prejudice to the defendant: "an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'"  After finding there to have been overwhelming evidence of guilt on the multiple charges, and a likelihood that evidence from each criminal event would have been admissible in separate trials, the Supreme Court concluded that any error in conducting a joint trial in *Lane* had had no substantial influence on the jury's verdicts.  *Id.* at 450.

 If we were to evaluate Nitsche's Ground Four claim on the merits, the task would be to determine whether the Ohio Court of Appeals' decision to reject Nitsche's improper joinder claim resulted in a decision that was contrary to or an unreasonable application of clearly established United States Supreme Court precedent.  It was not.  The Ohio Court of Appeals' analysis was consistent with and neither contrary to nor an unreasonable application of clearly established federal law.  Under AEDPA, this court owes several layers of deference to the Ohio courts' rulings on this issue: we defer to the state court's determination issues of state law, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); we defer to the state courts' factual determinations unless Nitsche rebuts them by clear and convincing evidence, 28 U.S.C. § 2254(e)(1); and we defer to the Ohio courts' determination of federal constitutional law unless it was contrary to or an unreasonable application of clearly established federal law, *Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).  Nitsche cannot demonstrate that he is entitled to relief on any of these points.

 In the event the Court chooses to analyze the merits of Nitsche's Ground Four claim, I recommend that claim be dismissed for lack of merit.

VI.     **Recommendation Regarding Certificate of Appealability**

A.     **Legal Standard**

As amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that"[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that"'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n. 4 (1983)); *accord Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000). The statute requires that certificates of appealability specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that"[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks the requirement of § 2253(c)(3) that any grant of a certificate of appealability" state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a). In light of the Rule 11 requirement that the Court either grant or deny

the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

### B.  Analysis

The resolution of the Nitsche's Ground One, Ground Three and Ground Four claims for relief on procedural grounds cannot reasonably be debated.  Likewise, the conclusion that Nitsche's Ground Two and Ground Four claims lack merit cannot reasonably be debated.  Thus, I recommend that a certificate of appealability not be granted.

## VII.  Recommendations

Because Nitsche's Ground One, Ground Three and Ground Four claims have been procedurally defaulted and/or raise only noncognizable state law claims, I recommend they be dismissed.  And because Nitsche's Ground Two claim lacks merit, I recommend it be dismissed. Ground Four can be dismissed on the merits should the Court prefer to dispose of the claim on that basis.  If the Court accepts these recommendations, I recommend that the Court deny Nitsche's petition for writ of habeas corpus under 28 U.S.C. § 2254.  I further recommend that Nitsche not be granted a certificate of appealability.

Dated: July 26, 2019

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).